# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

KIP BUENTING,

        Plaintiff,

vs.

DAN RILEY, Individually and in his
official capacity as a Fort Dodge, Iowa,
Police Officer, THOMAS FRANCIS,
Individually and in his official capacity as
Chief of the Fort Dodge, Iowa, Police
Department, and THE CITY OF FORT
DODGE, IOWA,

        Defendants.

No. C04-3001-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

*I.* *INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    *A.* *Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . 11
    *B.* *Analysis of Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        *1.* *Fourth Amendment claim against Riley* . . . . . . . . . . . . . . . 13
            *a.* *Third Street bridge incident* . . . . . . . . . . . . . . . . . . 15
            *b.* *Incident in front of Buenting's father's house* . . . . . . 17
            *c.* *Incident on First Avenue South* . . . . . . . . . . . . . . . . 20
            *d.* *Qualified immunity* . . . . . . . . . . . . . . . . . . . . . . . 22
        *2.* *Substantive due process claim against Riley* . . . . . . . . . . . . 25
        *3.* *Claim against Francis* . . . . . . . . . . . . . . . . . . . . . . . . . 27
        *4.* *Claim against City* . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

Plaintiff Kip Buenting filed this lawsuit on January 5, 2004, against a Fort Dodge, Iowa, police officer, the Chief of the Fort Dodge Police Department and the City of Fort Dodge. At the center of this lawsuit is alleged continual harassing conduct by the police officer and the failure of the chief of police to curtail the alleged harassing conduct. Specifically, in his complaint, Buenting alleges that defendant Dan Riley violated 42 U.S.C. § 1983 by violating Buenting's rights under the Fourth Amendment to be free from unlawful seizures by unlawfully detaining him and when he swerved his patrol car toward Buenting's vehicle. Buenting also alleges that defendant Thomas Francis violated Buenting's constitutional rights when he did not offer Buenting services and protection from the alleged conduct of Riley and when he did not throughly investigate Buenting's complaints about Riley's conduct.

Defendants have moved for summary judgment on all claims. Defendants assert that the conduct complained of by Buenting does not implicate a constitutional right. Defendants further argue that some of the conduct complained of cannot be said to be "under color of law" and that the alleged conduct which arguably was done under color of law does not rise to the level of a constitutional violation. Defendants alternatively argue that even if defendant Riley's conduct was unconstitutional that he is protected by

qualified immunity because the law is not clearly established. Defendants further argue that the claims against defendant Francis fail as a matter of law because a supervisor may not be held liable under § 1983 for the violations of a subordinate on a respondeat superior theory. Finally, defendants assert that summary judgment must be granted with respect to the City of Fort Dodge because no underlying constitutional violation has been established by Riley or Francis.

Defendants did not initially request oral arguments on their motion for summary judgment, but Buenting did in his resistance.[1] Although it has been the court's strong preference over the years to grant oral arguments whenever requested, the court has not found oral arguments necessary to the resolution of defendants' motion for summary judgment in this case. Moreover, the court's busy schedule—including post-trial motions in one federal death-penalty case and pre-trial motions, jury selection, and the start of trial in another—has not permitted the timely scheduling of oral arguments sufficiently in advance of trial in this matter to permit timely resolution of the motion for summary judgment. Finally, the court has not found oral arguments necessary to the resolution of defendants' motion for summary judgment in this case, not least because of the thorough briefing of all issues by the parties. Therefore, the court will resolve defendants' motion for summary judgment on the parties' written submissions.

Before turning to a legal analysis of the motion for summary judgment, the court must first identify the standards for disposition of a motion for summary judgment, as well as the undisputed factual background of this case.

---

[1] The court notes that it does appear that defendants checked the box on their CM-ECF filing requesting oral argument, but did not specifically request oral argument in their moving papers. None of the parties complied with Local Rule 7.1(d) which requires that: "A request for oral argument in a motion or brief must be noted separately in both the caption and the conclusion of the document, and must be supported by a showing of good cause."

### B. Factual Background

The record reveals that the following facts are undisputed for the purposes of defendants' Motion For Summary Judgment. Kip Buenting was a resident of Fort Dodge, Iowa from 1970 until April 2004. Buenting's girlfriend is Jean Greve. Dan Riley was a patrol officer with the Fort Dodge Police Department from 1997 until April of 2004. Riley's wife, Jana Riley, is the sister of Greve. Riley has told people that a dispute between him and Buenting arose approximately five to six years ago when the two came into contact at a bar where they both were drinking. One felt that the other had made fun of him.

Buenting began dating Greve in September of 2002. Approximately two months after Buenting began dating Greve, Buenting was driving from his home to the gym where he exercises early in the morning. Riley was working traffic enforcement on the Third Street Bridge in Fort Dodge. Riley observed Buenting's vehicle doing 38 m.p.h. in a 25 m.p.h. zone. Riley pulled Buenting over and gave him a warning. Buenting admits that he did not have a current insurance card in his vehicle and does not contest that he was driving over the speed limit.

Approximately one week later, again early in the morning, Riley was again working traffic enforcement on the Third Street Bridge in Fort Dodge. When Buenting crossed the bridge, Riley followed him and stopped him when Buenting turned onto First Avenue North. Riley told Buenting that he stopped him to check if he had current insurance documentation. Approximately one week later, at the same location and at approximately the same time, Riley again started to follow Buenting over the bridge and onto First Avenue North. Riley was following Buenting so closely that at times Buenting could not see the headlights of Riley's police patrol car in his rear view mirror. At no time did Riley utilize his red lights. When Buenting turned onto Ninth Street, Riley stopped tailgaiting Buenting. No stop was made by Riley.

In December of 2002, at approximately 5:45 a.m., Riley was parked in his police patrol car at Dale's Corner Store just before the Third Street Bridge. When Buenting passed Riley's position, Riley pulled out and proceeded to follow Buenting's vehicle. While on the Third Street Bridge, Riley activated the red lights on his police patrol car. Although there is not sufficient space to completely pull over on the bridge, Buenting immediately pulled to the right as far as he could to yield to Riley's police patrol car. Riley then proceeded to go around Buenting and immediately turned off the red lights on his police patrol car and continued down the street.

On January 5, 2003, Buenting was on his way to a Christmas party at his father's house. Riley followed Buenting to this residence. Riley pulled his police patrol car to the side of the road. Riley never exited his vehicle. He warned Buenting that the tint on the windows of Buenting's car was too dark and in violation of a city ordinance. Riley advised Buenting that he should have the tint of his windows checked and that if Riley saw him driving the vehicle again, Riley would check the tint of the windows with a tint meter. Riley later told his wife that Buenting was driving with another woman when no other person was in Buenting's vehicle at the time. Immediately following these events, Buenting checked with Lt. Mernka of the Fort Dodge Police Department to ascertain whether the factory installed tint on the windows of his vehicle was illegal.

On January 9, 2003, Buenting parked his United Parcel Service ("UPS") delivery truck in front of the Webster County Courthouse. When he came out of the courthouse, Riley was sitting in a police patrol car staring at Buenting. Riley had pulled his police patrol car half-way into the street directly in front of Buenting, blocking Buenting's UPS truck. Buenting called Lt. Mernka to complain about Riley's actions.

On January 14, 2003 or January 17, 2003, at approximately 2:30 p.m., Riley followed Buenting while Buenting was driving his UPS delivery truck. As Buenting made a delivery, Riley pulled into an alley and watched Buenting. Buenting did not make an

obscene gesture in Riley's direction.

On January 31, 2003, Buenting was making UPS deliveries at a downtown Fort Dodge building. Riley drove by in his patrol car. Believing that the problems between the two of them had been resolved, Buenting waved at Riley. Riley immediately turned on the red lights of his patrol car. Riley came over to Buenting's UPS truck and asked, "what did he want." Riley told Buenting that he better not wave at him again, otherwise he was going to arrest him. Riley went on to say that while Buenting was in Florida for the Orange Bowl, Greve had been in Cedar Rapids with an ex-boyfriend. Riley did not "call out" the fact that he had left his patrol car even though he was under instructions to do so. Riley did not log the incident.

On February 6, 2003, Riley was on personal business at a pet supply store. Buenting made a UPS delivery to the pet supply store at the same time. Riley asserts that when Buenting walked into the store, he tried to cause a problem by asking Riley "what are you looking at." Riley contends that Buenting left the store before Riley. When Riley went out he asserts that Mountain Dew pop had been thrown all over his vehicle. This incident was investigated by the Fort Dodge Police Department at Riley's request. During the investigation, Lt. Mernka determined that the only type of soda Buenting drank was Diet Coke or Diet Pepsi. The clerk at the pet supply store indicated that Riley left the store before Buenting. A video tape recording of the actions in the pet supply store reveals that Buenting never made any comments to Riley and that Riley left the store before Buenting.

In February of 2003, Buenting and Greve took a trip to Mexico. On February 22, 2003, Dan Greene, who was watching Buenting's residence, discovered the gas shut off to Buenting's home. He reported the incident to the police and named Riley as a suspect.

By March 11, 2003, Riley was required to ride with other police officers while on patrol to protect him against citizen complaints being lodged against him. On March 11,

2003, Riley was a passenger in a patrol car being driven by Fort Dodge Police Officer Spindler. Riley made an obscene gesture at Buenting while Buenting was in his UPS delivery truck.[2]

On March 29, 2003, Buenting attended a family function for Greve's family at the Opera House. Riley did not attend this family function. While at the Opera House, someone threw oil or some substance on the hood of Buenting's vehicle and broke his grill. Buenting believes that this was directly related to Riley. Buenting complained to the Fort Dodge Police Department about the incident, naming Riley as a suspect. The Fort Dodge Police Department has rules and regulations dealing with what to do when there is a complaint against a police officer. Riley was not on duty at the time but stated that he was at his home.

On March 31, 2003, Buenting found nails in his driveway. He immediately reported the incident to the Fort Dodge Police Department, naming Riley as a potential suspect. A criminal investigation was conducted by the department. On April 13, 2003, while on airport duty, Riley made a comment to Officer Spindler that he would like to fly over Buenting's house and drop a railroad tie on it.

On May 15, 2003, Buenting pulled in front of Midiacom, next door to Riley's parents' plumbing business. Riley was in street clothing and flipped Buenting off and said, "You f***ing pussy." Riley contends that he has never done any such thing except to an ex-girlfriend, Mindy Kohnke. Kohnke filed a harassment lawsuit against Riley resulting in a $75,000.00 settlement with the City of Fort Dodge.

On July 2, 2003, Buenting was at Shoppers Supply to make a delivery. Riley was not on duty as a police officer but was waiting at the end of the Shoppers Supply's

---

[2]A number of times the parties make reference to Riley making an obscene gesture toward Buenting but the parties do not identify what gesture was made by Riley.

driveway in his pickup truck. As Buenting drove by in his UPS delivery trick, Riley was holding an instant camera in one hand and was flipping Buenting off with his other hand. During this exchange, Riley asked Buenting if he knew what the drug Valtrex was used to treat. Riley then stated that Buenting should ask Greve, "because she has herpes." Immediately after this incident, Buenting contacted his supervisor at UPS so that an investigation could be made and protection provided to Buenting through UPS management. This matter was also reported to the Fort Dodge Police Department as a complaint. Riley was named in the complaint as the perpetrator.

On July 16, 2003, at approximately 7:00 a.m., Buenting was driving to his residence. Riley, in his personal vehicle, stopped in the middle of the street in front of Buenting's house and flipped Buenting off. On July 18, 2003, at approximately 10:20 p.m., Buenting was driving his vehicle with Greve, his cousin and the cousin's wife. As Buenting was going south on Twenty-First Street, he met Riley going north. Riley immediately pulled a u-turn in his patrol car and followed Buenting. After following Buenting approximately nine blocks, Buenting turned onto Eighth Avenue while Riley continued straight. Buenting met Riley again at Twentieth Street and Highland Park. Riley intentionally swerved his patrol car toward Buenting's vehicle but swerved away at the last moment. All of the individuals in Buenting's vehicle believed that they were about to be struck by Riley's patrol car. As Riley went past, he made "an obscene gesture." Plaintiff's App. at 20. Buenting immediately went to the Fort Dodge Police Department to file a complaint. Buenting subsequently filed a written complaint with the Fort Dodge Police Department. Buenting's complaint was investigated and Riley was ultimately given a three-day suspension as a sanction for his actions.

On September 21, 2003, both Buenting and Greve received threatening letters in the mail instructing them to stop lying to the mayor and the police. Although the letters were turned over to the United States Postal Service, they did not perform any type of

investigation because the authorities did not view the letters as threatening. The letters were subsequently turned over to the Webster County Sheriff's Office and the Iowa Department of Criminal Investigations ("DCI"). An investigation is ongoing. Riley has claimed to also have received such a threatening letter but has not produced it. Riley was named a suspect in having sent these letters.

On October 6, 2003, at approximately 3:35 p.m., Buenting was on a UPS delivery on Highway 7. Riley drove by in a civilian vehicle, honked, made an obscene gesture to Buenting and called Buenting a "pussy." On October 22, 2003, Buenting and Riley met on First Avenue South and Eleventh Street. Riley was driving his personal vehicle and Buenting was driving a U.P.S. delivery truck. Riley made an obscene gesture at Buenting. On November 6, 2003, Buenting and Riley passed each other on Central Avenue. Riley was driving a civilian mini-van. Riley made an obscene gesture at Buenting.

On December 16, 2003, a brick was thrown at Buenting's home, damaging the building's exterior. The following morning, Buenting called the Fort Dodge Police Department and named Riley as a suspect. Although Riley has indicated that he was at home asleep at the time of this incident, he has also admitted that he could have been out with his cousin Dave Hubbard. The police investigated Buenting's complaint and determined that footprints found outside Buenting's home could not belong to Riley because the prints were too small. The police did not check to find out Hubbard's shoe size.

Buenting alleges that on February 21, 2004, he was driving on First Avenue South when Riley approached from behind in his police patrol car. Riley activated his red lights and passed Buenting. While doing so, Riley made an obscene gesture toward Buenting. Riley denies that this event occurred because he was at his father's business at the time. Later that same day, Buenting was passing Ron's Car Wash when Riley, in his patrol car, made an obscene gesture toward Buenting.

On March 5, 2004, Buenting claims that Riley made an obscene gesture toward him while they passed each other on the street. By this point, Riley had resigned from the Fort Dodge Police Department. Also on this date, Buenting received a telephone call in which the caller left a message on Buenting's telephone recorder in which the caller says, "fuck you."

All complaints made by Buenting were investigated by Thomas Francis, Chief of the Fort Dodge Police Department or some other police officer to determine if there was validity to the complaint. Francis took disciplinary action against Riley on the one complaint that Francis believed could be substantiated by witnesses.

Riley was given a written warning for insubordination on January 28, 2003 for lying to a superior officer regarding why he was tardy with a written report. Citizen complaints were filed against Riley by Jessica Smith, regarding the appropriateness of a body search that occurred at the police station, and Leslie Mosely, regarding Riley's alleged fondling of Mosely's person while under arrest. On October 22, 1998, Riley was found guilty of Third Degree Harassment of Mindy Konke. Nothing in Riley's police personnel file shows that any disciplinary action was taken by the Fort Dodge Police Department on account of this action or the fact that a federal lawsuit was filed based upon it.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F. Supp. 1224, 1230-31 (N.D. Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F. Supp. 1303, 1305-07 (N.D. Iowa 1997); *Laird v. Stilwill*, 969 F. Supp. 1167, 1172-74 (N.D. Iowa 1997); *Rural Water Sys. #1 v. City of Sioux Ctr.*, 967 F. Supp. 1483, 1499-1501 (N.D. Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir. 2000), *cert. denied*, 121 S. Ct. 61 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966

F. Supp. 812, 817-18 (N.D. Iowa 1997), *aff'd*, 205 F.3d 1347 (8th Cir. 2000) (Table op.);

*Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F. Supp. 1237, 1239-40 (N.D.

Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F. Supp. 805 (N.D.

Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to

say that Rule 56 itself provides, in pertinent part, as follows:

> Rule 56. Summary Judgment
>
>    (a) For Claimant. A party seeking to recover upon a
> claim, counterclaim, or cross-claim or to obtain a declaratory
> judgment may, at any time after the expiration of 20 days from
> the commencement of the action or after service of a motion
> for summary judgment by the adverse party, move with or
> without supporting affidavits for a summary judgment in the
> party's favor upon all or any part thereof.
>    (b) For Defending Party. A party against whom a claim
> . . . is asserted . . . may, at any time, move for summary
> judgment in the party's favor as to all or any part thereof.
>    (c) Motions and Proceedings Thereon. . . . *The
> judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no
> genuine issue as to any material fact and that the moving party
> is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's

function at the summary judgment stage of the proceedings is not to weigh the evidence

and determine the truth of the matter, but to determine whether there are genuine issues

for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v.

Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). An issue of material fact is genuine

if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir. 1992)

(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

As to whether a factual dispute is "material," the Supreme Court has explained, "Only

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995); *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Quick*, 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of the defendants' Motion For Summary Judgment.

### B.  Analysis of Claims

Defendants have sought summary judgment on each of the claims against defendants Riley, Francis and the City of Fort Dodge. The court will address each claim *seriatim* after discussing the requirements for a valid § 1983 claim.

The United States Supreme Court has instructed that: "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *accord Baker v. McCollan*, 443 U.S. 137, 140 (1979); *Scheeler v. City of St. Cloud*, 402 F.3d 826, 830 (8th Cir. 2005); *Kuha v. City of Minnetonka*, 365 F.3d 590, 606 (8th Cir. 2003); *Murray v. City of Onawa*, 323 F.3d 616, 619 (8th Cir. 2003); *S.J. v. Kansas City Mo. Public Sch. Dist.*, 294 F.3d 1025, 1027 (8th Cir. 2002); *Hott v. Hennepin County, Minn.*, 260 F.3d 901, 905 (8th Cir. 2001); *Kinman v. Omaha Public Sch. Dist.* 171 F.3d 607, 611

(8th Cir. 1999); *Roe v. Humke*, 128 F.3d 1213, 1215 (8th Cir. 1997). Absent a violation of a constitutional right, there is no "claim cognizable under Section 1983." *Baker*, 443 U.S. at 146-47.

### 1. *Fourth Amendment claim against Riley*

Defendants initially seek summary judgment on plaintiff Buenting's Fourth Amendment claim against Riley. Defendants argue that Buenting has not been deprived of a right secured by the United States Constitution. In his moving papers, Buenting specifically points to three events which support his Fourth Amendment claim against Riley: first, the second traffic stop of Buenting by Riley that occurred on the Third Street Bridge in November of 2002; second, the incident in front of Buenting's house where Riley warned Buenting regarding the tint on the windows of Buenting's vehicle; and, third, the incident on February 21, 2004, in which Buenting and Greve were driving on First Avenue South when Riley activated his red lights on his patrol car and then, after Buenting had pulled over, Riley came alongside Buenting's vehicle, made an obscene gesture toward Buenting, then turned off his red lights and left the scene. Defendants contend that summary judgment should be entered in defendant Riley's favor on Buenting's claim under the Fourth Amendment, because, for each of the three incidents which Buenting complains, Riley had reasonable suspicion to stop Buenting or that Riley's actions do not rise to the level of a seizure under the Fourth Amendment. Thus, defendants contend that Buenting's Fourth Amendment rights were not violated.

The first clause of the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. The Fourth Amendment "guarantees the privacy, dignity and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 614 (1989); *see also Chandler v. Miller*,

520 U.S. 305 (1997). It protects against intrusions not justified by the circumstances, or conducted in an improper manner. *Schmerber v. California*, 384 U.S. 757, 767 (1966). "[T]he permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner*, 489 U.S. at 619 (quotation and citations omitted).

It is well-settled law that if a police officer pulls over a motorist without reasonable suspicion to do so, that action violates the Fourth Amendment. *See Wren v. United States*, 517 U.S. 806, 809-10 (1996) (stating that the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]"); *Delaware v. Prouse*, 440 U.S. 648, 663 (1979) ("Except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment."); *Thomas v. Dickel*, 213 F.3d 1023, 1024 (8th Cir. 2000) (noting that "[a]n investigative stop is constitutional if the police have reasonable suspicion "that the person stopped is, or is about to be, engaged in criminal activity.") (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *see also United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (instructing that "[w]hether a traffic stop is valid under the Fourth Amendment turns on whether 'this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'") (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)); *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002) (stating that an investigatory traffic stop requires reasonable suspicion); *Price v. Kramer*, 200 F.3d 1237, 1248 (9th Cir. 2000) (stating that a vehicle

stop without reasonable suspicion is unreasonable under the Fourth Amendment); *United States v. Mikell*, 102 F.3d 470 (11th Cir. 1996) (holding that a brief detention of a vehicle is reasonable within the meaning of the Fourth Amendment where it is conducted "in order to investigate a reasonable suspicion that such persons are involved in criminal activity.").

### a.    Third Street bridge incident

With respect to the second traffic stop of Buenting by Riley that occurred on the Third Street Bridge in November of 2002, defendants argue that Riley had reasonable suspicion to stop Buenting on that occasion to check if he was driving with valid proof of insurance. Defendants point out that only days before this stop, Riley had performed a traffic stop on Buenting and found that he did not have valid proof of insurance as required under Iowa law. *See* IOWA CODE § 321.20B. Defendants contend that when Riley again observed Buenting driving, he pulled him over with reasonable suspicion that he was driving without valid proof of insurance. Buenting, on the other hand, contends that police officers cannot stop a person just to ascertain whether they are in compliance with the law and that Riley's stop of Buenting was done as a means of harassment.

Thus, the issue here is whether Riley had a reasonable and articulable suspicion that a traffic violation occurred or was occurring when he stopped Buenting on this occasion. *See United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Gonzales*, 220 F.3d 992, 925 (8th Cir. 2000). The United States Supreme Court has observed that reasonable suspicion requires "'a particularized and objective basis' for suspecting the person stopped of criminal activity," *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quoting *Cortez*, 449 U.S. at 417); *see also United States v. Bustos-Torres*, 396 F.3d 935, 941 (8th Cir. 2005); *Gonzales*, 220 F.3d at 925. This standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. . . ." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). However, the standard does require "a minimal level of objective justification" for the police action. *Id.*

While "reasonable suspicion" must be more than an inchoate "hunch," "the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)), *cert. denied*, 2005 WL 636170 (U.S. Apr. 18, 2005). "'Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances.'" *United States v. Maltais*, 403 F.3d 550, 553 (8th Cir. 2005) (quoting *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994)); *accord United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Bustos-Torres*, 396 F.3d at 941; *United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004); *Fuse*, 391 F.3d at 929; *United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir. 2004); *United States v. Hurt*, 376 F.3d 789, 792 (8th Cir. 2004); *United States v. Dodson*, 109 F.3d 486, 488 (8th Cir. 1997); *United States v. Atlas*, 94 F.3d 447, 451 (8th Cir. 1996); *United States v. Halls*, 40 F.3d 275, 276 (8th Cir. 1994). Here, the court concludes that Riley made a valid investigative stop of Buenting's vehicle, based on suspicion that Buenting may have been driving without valid proof of insurance as required under Iowa law as a result of Riley's previous stop of Buenting. A police officer's prior dealings with the particular individual can contribute to the basis for reasonable suspicion, as required to support an investigatory stop. *See United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002). Based on his prior stop of Buenting, which had occurred approximately one week before, in which Buenting was unable on that occasion to produce a valid insurance card, Riley had much more than an inchoate and unparticularized suspicion or hunch that Buenting might be engaged in the criminal activity of driving without proof of insurance. Considering the totality of the circumstances surrounding Riley's stop of Buenting, the court concludes that Riley had a reasonable, articulable suspicion that criminal activity was afoot when he stopped Buenting on this occasion. Therefore, this portion of defendants' Motion for Summary Judgment is

granted.

### b.     *Incident in front of Buenting's father's house*

Turning to the incident on January 5, 2003, in front of Buenting's father's house, on that occasion Buenting was on his way to a Christmas party at his father's house. Riley followed Buenting to Buenting's father's residence. Once there, Riley pulled his police patrol car to the side of the road, but Riley never exited his vehicle. He proceeded to warn Buenting that the tint on the windows of Buenting's car was too dark and in violation of a city ordinance and advised Buenting that he should have the tint on his windows checked. Riley further advised that if he saw Buenting driving the vehicle again, Riley would check the tint of the windows with a tint meter.

In determining whether an encounter between a police officer and a citizen constitutes a Fourth Amendment detention or seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (holding that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"); *United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir. 2003) ("In determining whether a person has been seized for Fourth Amendment purposes, the relevant question is whether, in view of the totality of circumstances surrounding the incident, a reasonable person would have believed he was free to leave."). This "'reasonable person' test presupposes an innocent person." *Bostick*, 501 U.S. at 438. When conducting this analysis, "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the

display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554; *Johnson*, 326 F.3d at 1021 (noting that "[s]ome circumstances that inform the determination of whether a seizure took place include: officers positioning themselves in a way that limits the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication that the person is the focus of a particular investigation . . ."), *cert. denied*, 540 U.S. 962 (2003). "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Mendenhall*, 446 U.S. at 555. Whether a seizure occurred is a question of law. *See Id.* at 554-555; *United States v. Galvano-Muro*,141 F.3d 904, 906 (8th Cir. 1998); *see also Brown v. City of Oneonta*, 235 F.3d 769, 776 n.2 (2d Cir. 2000), *cert. denied*, 534 U.S. 816 (2001); *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998); *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996); *United States v. Maragh*, 894 F.2d 415, 417-418 (D.C. Cir.), *cert. denied*, 498 U.S. 880 (1990).

Applying these Fourth Amendment principles to the facts of this case, the court concludes that Buenting was not seized when Riley pulled up in front of Buenting's father's house and warned him that the tint on the windshield of Buenting's vehicle was too dark. The Supreme Court has noted that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Bostick*, 501 U.S. at 438 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). This is precisely the type of interaction that occurred in front

of Buenting's father's house.  Riley, from the seat of his patrol car, conveyed to Buenting, who was standing outside his vehicle in front of his father's house, that he believed the tint on Buenting's vehicle to be illegal.  Riley did not touch Buenting, make any commands of him, display his weapon in a menacing manor, or otherwise take any action to restrain or control Buenting's movements.  *See United States v. Chan-Jimenez*, 125 F.3d 1324 (9th Cir. 1997) (holding that motorist was subjected to Fourth Amendment "seizure" without reasonable suspicion where motorist was stopped on edge of desert highway and officer pulled immediately behind him and activated his emergency lights, officer kept his hand on his revolver throughout encounter, and officer never asked whether motorist was having trouble, but instead asked for motorist's papers and, after determining that they were in order, held on to them and asked for permission to search vehicle).  Therefore, viewing these facts in their entirety and drawing all reasonable inferences therefrom in favor of plaintiff Buenting, the court concludes that, as a matter of law, the encounter in front of Buenting's father's house does not constitute a seizure within the meaning of the Fourth Amendment. *See United States v. Barry*, 394 F.3d 1070, 1074 (8th Cir. 2005) (holding that police officer's conduct in approaching defendant's parked vehicle in vacant parking lot behind a mall, parking his patrol car approximately 15 feet away, and knocking on the window of defendant's vehicle did not amount to a show of authority such that a reasonable person would believe he was seized); *United States v. Hendricks*, 319 F.3d 933 (7th Cir.) (holding that encounter between police officer and occupants of car that the officer followed into gas station in early morning was consensual rather than a stop within the meaning of the Fourth Amendment where the police officer did not signal the car to pull over, did not activate his emergency lights when the car pulled into the gas station, stopped about 15 feet behind the car once it parked in the gas station, and did not shine a light on the car, and where there was nothing in front of the car to block its exit, and the car's driver got out of the car and approached the police officer), *cert. denied*, 540 U.S. 856

(2003); *United States v. Perez-Sosa*, 164 F.3d 1082, 1084 (8th Cir. 1998) (holding that no seizure of individual occurs when police officer approaches and "requests identification, as long as the officer does not convey that compliance is required.");*United States v. Jones*, 990 F.2d 405, 408 (8th Cir. 1993) (holding that Fourth Amendment is not implicated when "officers merely approach and question a person, as long as the account is consensual in nature and does not involve coercion or restraint of liberty."); *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) (noting that "a police officer is free to approach a person in public and ask a few questions; such conduct, without more, does not constitute a seizure."). Therefore, this portion of defendants' Motion for Summary Judgment is granted.

### c.   *Incident on First Avenue South*

The third incident that Buenting specifically points to as supporting his Fourth Amendment claim against Riley is the incident on February 21, 2004, in which Buenting and Greve were driving on First Avenue South when Riley activated his red lights on his patrol car and then, after Buenting had pulled over, Riley came alongside Buenting's vehicle, made an obscene gesture toward Buenting, then turned off his red lights and left the scene.

The court has little difficulty concluding that when Riley activated his emergency lights, and Buenting pulled over and stopped as a result, that, a Fourth Amendment seizure occurred. It is well-established that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). As noted above, "a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. "*Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one:  not whether the citizen perceived that he was

being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari*, 499 U.S. 621, 628 (1991). Viewing all of the circumstances surrounding the situation in an objective manner, the court finds that a reasonable person would have believed that Riley's actions of activating his emergency lights was a show of authority indicating for Buenting to stop. Buenting complied with this show of authority; therefore, he was seized within the meaning of the Fourth Amendment. *See Malina v. Gonzales*, 994 F.2d 1121, 1126 (5th Cir. 1993) (finding that defendant's use of flashing red light to stop plaintiff on interstate was seizure by use of show of authority).

Defendants do not offer any justification for Riley's actions on the date in question. "It is well-settled law that if a police officer pulls over a motorist without reasonable suspicion to do so, that action violates the Fourth Amendment." *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 947 (9th Cir. 2003); *accord Price v. Kramer*, 200 F.3d 1237, 1248 (9th Cir. 2000) (stating that a vehicle stop without reasonable suspicion is unreasonable under the Fourth Amendment); *see United States v. Ramos-Caraballo*, 375 F.3d 797, 800 (8th Cir. 2004) (noting that a vehicle stop is reasonable "if it is supported by either probable cause to believe that a traffic violation has occurred, or an articulable and reasonable suspicion that criminal activity is afoot.") (citations omitted)); *see also United States v. Ozbirn*, 189 F.3d 1194, 1197 10th Cir. 1999) (noting that "[p]rior cases establish that a traffic stop is reasonable under the Fourth Amendment at its inception if the officer has either (1) probable cause to believe a traffic violation has occurred. . . or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'") (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995), *cert. denied* 518 U.S. 1007 (1996) (further quotations and citations omitted)). Thus, the court finds that Buenting has established that he was subject to an unlawful seizure when Riley pulled him over

during the incident on Fourth Avenue South. Thus, the question becomes, may Buenting recover damages? Riley contends that any damage award is foreclosed by the doctrine of qualified immunity.

### d. Qualified immunity

Riley asserts that he is entitled to qualified immunity on Buenting's Forth Amendment claim. "'Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.'" *Wilson v. Layne*, 526 U.S. 603, 613 (1999). "Qualified immunity shields governmental officials from personal liability if their actions, even if unlawful, were 'nevertheless objectively reasonable in light of the clearly established law at the time of the events in question.'" *Turpin v. County of Rock*, 262 F.3d 779, 783 (8th Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)). Thus, "[q]ualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001). "In other words, officials are protected by qualified immunity so long as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Wilson*, 260 F.3d at 951 (quoting *Anderson*, 483 U.S. at 638).

"In determining if [defendants] are entitled to qualified immunity [courts] must ask whether [the plaintiffs] stat[e] a violation of a constitutional right, and whether that right was clearly established at the time, such that a reasonable officer would have known that his conduct violated the law." *Wilson*, 260 F.3d at 951 (citing *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001)); *see also Turpin*, 262 F.3d at 783 ("The inquiry in determining

whether the officers are entitled to qualified immunity focuses on whether the [plaintiffs] have asserted a violation of a clearly-established constitutional right and, if so, whether there are genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated that right."); *Hunter v. Namanny*, 219 F.3d 825, 829 (8th Cir. 2000) (describing the test as a "three-part inquiry" under which the court asks "(1) whether [the plaintiff] has asserted a violation of a constitutional or statutory right; (2) if so, whether that right was clearly established at the time of the violation; and (3) whether, viewing the facts in the light most favorable to [the plaintiff], there are genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated that right"). Thus, even if a plaintiff has alleged violation of a clearly-established constitutional right, a defendant is entitled to summary judgment on the basis of the qualified immunity defense if that defendant establishes that there is no genuine issue of material fact that a reasonable official would not have known that the defendant's conduct violated that clearly-established right. *See, e.g., Hunter*, 219 F.3d at 831 ("Because it is clearly established that the Fourth Amendment requires a warrant application to contain a truthful factual showing of probable cause, we next consider the objective reasonableness of [the officer's] actions, i.e., whether there are genuine issues of material fact as to whether a reasonable official would have known that [the officer's] actions violated that requirement," and "given the genuine factual disputes that remain, a jury must decide whether [the officer's] actions were objectively reasonable.").

Here, defendants have not provided any explanation for Riley's actions in activating his emergency lights on the date in question. Rather, defendants argue that no reasonable officer would believe that activating his or her emergency lights causing a motorist to stop and the officer then proceeding on his way would constitute a seizure pursuant to the Fourth Amendment. However, as the court noted above, "[i]t is well-settled law that if a police officer pulls over a motorist without reasonable suspicion to do so, that action violates the

Fourth Amendment." *Bingham*, 341 F.3d at 947. This is not a novel or new legal proposition, for the federal courts have long required, at minimum, that a law enforcement officer must have reasonable suspicion to stop a motor vehicle. *See Arvizu*, 534 U.S. at 273; *Ornelas*, 517 U.S. at 696; *United States v. Brignoni-Price*, 422 U.S. 873, 881 (1975); *Maltais*, 403 F.3d at 553; *Ramos-Caraballo*, 375 F.3d at 800; *see also United States v. Hudson*, ___F.3d___, 2005 WL 926967, at *4; *United States v. Askew*, 403 F.3d 496, 507 (7th Cir.2005); *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005); *Price*, 200 F.3d at 1248; *Ozbirn*, 189 F.3d at 1197. The court concludes that the right was clearly established at the time of Riley's stop of Buenting that law enforcement officers must have reasonable suspicion to stop a motorist. Thus, viewing the facts in this case in the light most favorable to Buenting, the court concludes that there has been a showing that Riley violated Buenting's Fourth Amendment rights by pulling Buenting over without reasonable suspicion. Accordingly, defendant Riley is not entitled to qualified immunity as a defense to Buenting's claim. Therefore, this portion of defendants' Motion for Summary Judgment is denied.

### 2. *Substantive due process claim against Riley*

Defendants also seek summary judgment on plaintiff Buenting's substantive due process claim against Riley. Buenting asserts that the court should apply the substantive due process "shocks the conscience" test to Riley's cumulative conduct. Defendants point out that Buenting has cited no authority to support his claim that the cumulative actions of a law enforcement officer may be judged by the "shocks the conscience" standard. Defendants further argue that even if that is the correct standard, Riley is entitled to qualified immunity on this claim.

The Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power or employing it as an instrument of oppression." *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1989)

(quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)). In its substantive form, the Due Process Clause protects individuals from arbitrary or oppressive behavior by government officials. *Daniels v. Williams*, 474 U.S. 327, 331 (1986). The Eighth Circuit Court of Appeals has instructed that: "[A] substantive due process plaintiff 'must demonstrate both that the official's conduct was conscience-shocking, and that the official violated one or more fundamental rights that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."'" *Slusarchuk v. Hoff*, 346 F.3d 1178, 1181-82 (8th Cir. 2003) (quoting *Moran v. Clarke*, 296 F.3d 638, 651 (8th Cir. 2002) (*en banc*) (citations omitted)), *cert. denied*, 541 U.S. 988 (2004).

In *Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617 (1st Cir. 2000), the First Circuit Court of Appeals looked closely at a claim of substantive due process for police conduct far more egregious than alleged to have occurred in this case. In *Cruz-Erazo*, the plaintiffs, homeowners who had permitted defendants (police officers) the use of their unoccupied dwelling for storage during a hurricane warning, alleged that the same and other police officers verbally harassed them, occupied their house without permission, deliberately lied on official documents, and perjured themselves in official court proceedings with intention of causing the plaintiffs further harm. *Id.* at 618-20. In concluding that the plaintiffs had failed to state a claim of substantive due process violation, the court of appeals noted that:

> Although each determination of whether state conduct "shocks the conscience" is necessarily fact-specific and unique to the particular circumstances in which the conduct occurred, we think that our precedents steer us toward the conclusion that appellants have failed to articulate a claim under the Fourteenth Amendment. The majority of the conduct alleged by appellants was not physically intrusive or violent, nor did it "strike at the basic fabric" of any protected relationship, such as the parent-child relationship in *Grendell* [v. *Gillway*, 974 F. Supp. 46 (D. Me. 1997)]. In fact, we find appellants'

25

allegations largely comparable to those presented in *Pittsley* [v. *Warish*, 927 F.2d 3 (1st Cir.), *cert denied*, 502 U.S. 879 (1991)], and appellants have offered us no basis whatsoever for finding that precedent distinguishable, nor have they offered any substantive argument or explanation to justify the unusual step of finding a violation of substantive due process. As in previous decisions, we expressly leave open the question of whether verbal harassment and intimidation of this general type might, under appropriate circumstances, be found to violate due process. We simply hold that appellants have failed to state such a claim in this case.

*Id.* at 623.[3] The court concludes that the harassment and intimidation of Buenting by Riley in this case, while reprehensible, is not so severe as to shock the conscience and give rise to a substantive due process claim. The court notes that several of the most appalling actions alleged to have been committed against Buenting by Riley, the vandalism to Buenting's home and the nails being left in Buenting's driveway, are completely unsupported by any evidence of record. Although Riley may well have had a motive to commit these actions, there is no evidence which would permit a reasonable fact finder to draw the conclusion that Riley did, in fact, commit these actions. The remaining actions alleged to have been committed by Riley pale in comparison to those actions which have previously been found insufficient to shock the conscience and give rise to a substantive due process violation. *Cruz-Erazo*, 212 F.3d at 623; *Pittsley*, 927 F.2d at 7. The Supreme Court formulated the "shocks the conscience" test in *Rochin v. California*, 342 U.S. 165 (1952), where it found that the forced pumping of a suspect's stomach to obtain evidence

---

[3]In *Pittsley*, 927 F.2d 3, the defendant police officers allegedly threatened to kill Ms. Pittsley on more than one occasion, told Ms. Pittsley's young children that if the police caught their father the children would never see him again, and also refused to allow the children to give their father a goodbye hug when he was arrested. The First Circuit Court of Appeals held that this "despicable and wrongful" harassment did not rise to the level of a constitutional violation. *Id.* at 7.

so offended due process that it "shock[ed] the conscience." *Id*. at 172-173. The Eighth Circuit has found conduct sufficiently shocking where a police officer sexually assaulted and harassed a citizen during repeated visits to her work place. *See Haberthur v. City of Raymore, Missouri*, 119 F.3d 720 (8th Cir. 1997). Here, in contrast, the court notes that there was no physical contact whatsoever between Riley and Buenting, let alone the sadistic actions found in *Haberthur*. Accordingly, the court concludes that the conduct of Riley does not sufficiently shock the conscience as to violate substantive due process. Therefore, this portion of defendants' Motion for Summary Judgment is granted.[4]

### 3. Claim against Francis

Defendants next seek summary judgment on plaintiff Buenting's claim against defendant Francis for failure to supervise defendant Riley. To succeed on his claim against Francis, Buenting must prove that Francis was deliberately indifferent to the rights of citizens who came into contact with Riley or tacitly authorized the offending acts. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996); *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994), *cert. denied*, 514 U.S. 1004 (1995); *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997). Buenting must show prior instances of unconstitutional conduct demonstrating that Francis has ignored a history of abuse and was clearly on notice that his supervision of Riley was deficient and likely to cause injury. *See Andrews*, 98 F.3d at 1076; *Thelma D. v. Board of Educ.*, 934 F.2d 929, 932-34 (8th Cir. 1991); *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Stemler*, 126

---

[4]Because the court has concluded that Riley's actions do not sufficiently shock the conscience so as to violate substantive due process, the court need not reach the issue of whether Riley's conduct was "under color of law." Moreover, the court need not consider defendants' assertion of qualified immunity.

F.3d at 865 (citation omitted). In this case, Buenting has not demonstrated that Francis was deliberately indifferent to the rights of citizens who came into contact with Riley or tacitly authorized the offending acts. Although Buenting argues that there was no proper investigation of Riley after his complaints, he has not shown any instances of unconstitutional conduct by Riley prior to the incident on February 21, 2004, on First Avenue South. Thus, Buenting has not demonstrated that Francis was placed on notice that his supervision of Riley was deficient and likely to cause injury. Therefore, this portion of defendants' Motion for Summary Judgment is granted.

### 4. *Claim against City*

Defendants finally seek summary judgment on plaintiff Buenting's claim against the City of Fort Dodge. Defendants argue that absent an underlying constitutional violation, there can be no municipal liability as a matter of law. However, as the record is sufficient to establish a § 1983 claim against defendant Riley, the City of Fort Dodge is not entitled to summary judgment. Therefore, defendants' Motion For Summary Judgment is denied with respect to the claims against defendant the City of Fort Dodge.

## III. CONCLUSION

Initially, the court concludes that Riley had a reasonable, articulable suspicion that criminal activity was afoot when he stopped Buenting for the second time in November of 2002 on the Third Street Bridge. The court also concludes that Buenting was not seized when Riley pulled up in front of Buenting's father's house and warned him that the tint on the windshield of Buenting's vehicle was too dark. However, the court does find that there has been a showing that Riley violated Buenting's Fourth Amendment rights by pulling Buenting over without reasonable suspicion. Moreover, the court concludes that defendant Riley is not entitled to qualified immunity as a defense to Buenting's claim. With respect to Buenting's substantive due process claim against Riley, the court concludes that Riley's

conduct does not sufficiently shock the conscience so as to violate substantive due process. Therefore, defendants' Motion for Summary Judgment with respect to Buenting's claims against Riley is granted in part and denied in part. The court next concludes that Buenting has not demonstrated that defendant Francis was deliberately indifferent to the rights of citizens who came into contact with Riley or tacitly authorized the offending acts. Therefore, defendants' Motion for Summary Judgment with respect to Buenting's claims against Francis is granted. Finally, the court concludes because the record is sufficient to establish a § 1983 claim against defendant Riley, the City of Fort Dodge is not entitled to summary judgment. Therefore, defendants' Motion For Summary Judgment is denied with respect to the claims against defendant the City of Fort Dodge.

**IT IS SO ORDERED.**

**DATED** this 13th day of May, 2005.

_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA